In the Matter of BARBARA B. VANNECK, Petitioner, against CITY BANK FARMERS TRUST COMPANY, Respondent.

Supreme Court, Special Term, New York County, July 14, 1945.

*Percival E. Jackson* for petitioner.

*Mitchell, Capron, Marsh, Angulo & Cooney* for respondent.

HECHT, J. This proceeding involves the constitutional validity of and the construction to be given to subdivision 2 of section 100-b of the Banking Law.

In 1928, respondent loaned $3,400,000 on the security of a first mortgage upon the premises at the southwest corner of Fifth Avenue and 52d Street, Manhattan. Pursuant to the provisions of what was then subdivision 7 of section 188 of the Banking Law (since superseded by subdivision 2 of section 100-b), the entire beneficial interest in the bond and mortgage was from time to time apportioned to various accounts with respect to which respondent was acting in a fiduciary capacity. The section then provided that investments in bonds and mortgages by a corporation acting as fiduciary might be made '' by apportioning to any estate or fund held by such corporation in any of such capacities a part interest in a bond and mortgage held by or in the name of such corporation, individually or in any representative capacity ''.

Subdivision 2 of section 100-b of the Banking Law provides: '' In case any bond or mortgage shall be held by, or in the name of, such trust company and it shall hold any part interest therein, acting as a fiduciary,'' it may extend the mortgage and reduce the rate of interest, '' upon the consent of the holders of such part interests to the extent of sixty-six and two-thirds per centum of the whole amount of such bond and mortgage ''. Notice of such proposal is required to be given to each holder of a part interest. Any holder objecting to the proposal '' shall have the right to apply  *  *  *  to the supreme court  *  *  *  and, *subject to the discretion of the supreme court in the premises,* to obtain an order enjoining such waiver, modification, extension or agreement. In the event of the granting of such an order, any holder shall have the right to apply to such supreme court and, *subject to the discretion of the supreme court in the premises,* to obtain an order directing a partition of such bond and mortgage by a judicial sale thereof.'' The italicized language was added to the statute in 1944 (L. 1944, ch. 128), the section having originally been enacted in 1933 without such language (L. 1933, ch. 323, § 1).

The present unpaid amount of the mortgage is $3,342,339.53. Petitioner has acquired part interests therein aggregating $161,627.23 from individuals to whom they had been transferred upon distribution out of the beneficiary accounts to which they had been apportioned.

Respondent has proposed an extension and modification of the mortgage pursuant to the foregoing statute, and has obtained consents thereto from the holders of over 75% of the whole amount of the bond and mortgage. Petitioner opposes the proposed extension, and applies for an injunction as provided in the statute.

Petitioner asserts that she is entitled, as a matter of right, to an injunction to prevent respondent from attempting to bind petitioner's interest in the mortgage to any extension and that the court on this application is confined to determining her good faith. This is clearly untenable as a construction of the language of the statute as it now reads, regardless of what construction might be placed upon it prior to the 1944 amendment. If the Legislature intended the meaning claimed by petitioner it would have provided that the Supreme Court should grant the injunction if satisfied of the holder's good faith, instead of providing that her right to obtain such relief is " subject to the discretion of the supreme court in the premises ".

Petitioner apparently recognizes that her construction cannot be justified by the language used, because she urges that it must be adopted in order to avoid declaring the statute unconstitutional. She asserts that she is the legal owner of an undivided part interest in the bond and mortgage and, therefore, cannot be coerced into an extension agreement consented to by a majority of the participants and approved by the Supreme Court; that if the statute purported to do that, it would violate the contract clause of the Federal Constitution, especially since neither the original statute (L. 1933, ch. 323) nor the present amendment (L. 1944, ch. 128) contains any declaration of emergency and that in 1944, when the amendment was enacted, economic conditions were not such as to justify this impairment of her contract rights. I do not agree with this contention.

In *Matter of People (Tit. & Mtge. Guar. Co.)* (264 N. Y. 69) the court upheld the constitutionality of the Schackno Act (L. 1933, ch. 745) providing that a plan for extension and modification of a mortgage in which certificates of participation had been sold and guaranteed by a mortgage guarantee company would become binding upon all the participants if consented to by two thirds in amount and approved by the Supreme Court. In *Lauro v. Barker* (299 U. S. 521, affg. *sub nom. Matter of Mtge. Com. [1175 Evergreen Ave.]*, 270 N. Y. 436) the court sustained the constitutionality of the subsequent Mortgage Com-

mission Act (L. 1935, ch. 19), which provided that the necessary consents of the two thirds would be conclusively presumed from their failure to dissent after being given notice. The rationale of these decisions applies with equal force to the holders of certificates of participation in mortgages held in the name of a corporate fiduciary and apportioned among various holders pursuant to the provisions of the Banking Law. This clearly appears from the following quotations from the opinion of LEHMAN, J., in *Matter of People* (*Tit. & Mtge. Guar. Co.*) (*supra*): " The decisions of the United States Supreme Court do certainly establish these criteria: Legislation which impairs the obligation of a contract or otherwise deprives a person of his property can be sustained only when enacted for the promotion of the general good of the public, the protection of the lives, health, morals, comfort and general welfare of the people and when the means adopted to secure that end are reasonable. Both the end sought and the means adopted must be legitimate, *i.e.*, within the scope of the reserved power of the State construed in harmony with the constitutional limitation on that power. Even ' the economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts.' (*Home Building & Loan Assn.* v. *Blaisdell, supra* [290 U. S. 398].) * * * It cannot be doubted that the free liquidation of great amounts of indebtedness secured by mortgages would result in widespread ruin to real estate owners and in probable widespread damage to investors. That situation affects the economic welfare of the community and affects the vital interests of the community. Legislation intended to relieve that situation is directed towards a legitimate end." (Pp. 84, 85.)

" Each holder of a certificate is, under his contract, entitled to insist upon the enforcement of the bond, mortgages and other security in which he has an interest and to a *pro rata* share of the moneys collected. * * * Foreclosure may ruin the owner of the equity of redemption. General foreclosure of the vast amounts of mortgages in which groups of certificate holders are interested might so demoralize the real estate market that the value of all mortgages would be diminished and the credit of insurance companies and savings banks destroyed. In spite of all this the owner of a single certificate in a series has a contractual right to insist upon the enforcement of every contractual obligation in which he is interested and to refuse to accede to any impairment of such obligation by agreement. The statute was intended to meet that situation." (P. 92.)

"The fairness of these provisions is evident. They do not give to a majority in interest, however large, the power to coerce another holder to accede to any plan of reorganization by the majority. They do not give the court power to coerce a single holder to accede to any plan of which the court approves. They do give the court authority, after a hearing, to approve a reorganization plan which is consented to by two-thirds in amount of those interested and to declare such plan effective.

"We may assume that except for this statute a certificate holder might stand upon his contractual rights and refuse to accede to any plan of reorganization of the rights of the holders of the mortgage investment, however advantageous the plan of reorganization might be. We may even assume that the Legislature could not pass a law which would compel a single holder to accede to such a plan though approved by the court and consented to by a majority in amount of all the holders of interest in an investment, if only the rights of the parties to the contract were involved. * * * Unreasonable insistence on contractual rights may work a serious injury to the economic welfare of all the people. The statute must be judged in the light of that fact. Under conditions as they exist at present, the vital interests of the community call for legislation by which the investments of great numbers of people may be conserved and ruin averted." (Pp. 93–94.)

"We find that economic conditions create an immediate danger to the economic welfare and the vital interests of the community. We find that the Legislature in the exercise of its reserved power has adopted a remedy which is reasonably calculated to meet such conditions. No impairment of contract which results will substantially injure any person. The statute merely furnishes a shield against unreasonable attack on the vital interests of the community and an additional remedy for enforcement of obligations in manner fair to all." (Pp. 97–98.)

It is true that the Schackno Act and the Mortgage Commission Act each contain a declaration of emergency. However, this is not necessary in order to sustain the constitutionality of the statute. This is likewise made clear in *Matter of People (Tit. & Mtge. Guar. Co.) (supra,* pp. 94–95): "The Legislature has characterized the situation as a 'public emergency.' It is immaterial whether we call the situation an emergency or not. It is a situation in which the Legislature could properly declare, as it has done, that it is 'essential for the public interest to provide a procedure under which such bonds, mortgages or other security may be liquidated in an orderly manner

and under which the assets of the guaranty corporations may be administered and conserved equally and ratably in the interests of holders of mortgage investments.'

" It has been said that ' while emergency does not create power, emergency may furnish the occasion for the exercise of power '. (*Home Building & Loan Assn.* v. *Blaisdell, supra.*) Extraordinary conditions may call for extraordinary remedies. Whether an emergency exists or not, the test in each case is whether a situation exists which calls for the exercise of the reserved power of the State and whether the remedy adopted by the State is reasonable and legitimate. An individual may not justly complain of a reasonable legislative invasion of his usual rights or a reasonable legislative restriction of his usual liberty for the purpose of averting an immediate danger which threatens the safety and welfare of the community.

" To secure the foundations of credit and good faith in the performance of obligations, to prevent the adoption by the States of laws for the defeat of creditors and invasion of contractual obligations, the constitutional limitation was placed upon the States' ' power of changing the relative situation of debtor and creditor, of interfering with contracts.' (*Ogden* v. *Saunders,* 12 Wheat. [U. S.] 213, 354.) Here the Legislature has not attempted to change the relative situation of debtors and creditors or provided that any obligation of a contract shall be impaired without the consent of two-thirds in amount of the holders of an interest in such obligations. Performance by the debtor according to the letter of the bond may be demanded unless holders in that amount consent to its postponement or alteration. The statute is directed solely towards facilitating agreement among such holders in a plan which will be fair to all and to prevent unreasonable insistence upon the letter of the obligation of contracts when, under changed conditions, such insistence might work injury both to individuals similarly situated and to the community. It gives, indeed, to the creditors as a group a remedy which they did not have before; it deprives no one of a remedy which he would use for his legitimate benefit or without injury to others."

The Burchill Act (L. 1933, ch. 729, now Real Property Law, §§ 119–123) provides that where a mortgage is held by a banking corporation as trustee under an indenture pursuant to which bonds or certificates of parts or of shares have been issued to the public, a plan or reorganization thereof may be made binding upon all of the holders if approved by the Supreme Court, " unless within twenty days after the approval

of the plan one-third in principal sum of such holders shall file with the court duly acknowledged dissents therefrom'' (§ 122). This statute contained no declaration of emergency.

In *New York Trust Co.* v. *Benenson Bldg. Corp.* (256 App. Div. 803, leave to appeal to Court of Appeals denied 256 App. Div. 911), the court affirmed an order of CHURCH, J., which denied a motion by a participant in such a mortgage to vacate an order approving a plan of reorganization of the mortgage. No opinion was written by either court, but an examination of the briefs indicates that appellant's main argument was the unconstitutionality of the statute insofar as it bound her to a change in the terms of the mortgage to which she did not agree. The court could not have affirmed the order unless it was satisfied that the statute was constitutional.

The '' economic interests of the State * * * justify the exercise of its continuing and dominant protective power '' over these participations in mortgages apportioned to various beneficiaries pursuant to the foregoing provisions of the Banking Law. The protection of the interests of those for whom property is held in trust has always been a matter of great legislative concern and the forced liquidation of these mortgages, as in the case of certificated mortgages '' may work serious injury to the economic welfare of all the people.''

Even if it be assumed that the 1944 amendment, which provided that the obtaining of an injunction and a subsequent partition sale was '' subject to the discretion of the supreme court in the premises '', conferred upon the court, for the first time, the power to bind an objecting participant to an extension plan, the amendment may not be declared unconstitutional upon the ground urged by petitioner that the improved real estate situation in 1944 precluded the Legislature at that time from interfering with her contract rights. This is the holding of *East New York Sav. Bank* v. *Hahn* (293 N. Y. 622, 627–629), where the court upheld the constitutionality of the re-enactment of a moratorium legislation in 1943, saying: '' An extraordinary remedy which is appropriate and legitimate in an exigency resulting from abnormal conditions may be inappropriate and beyond the limits of the power of a State if temporary impairment of the obligation of a contract is continued after the exigency has passed. (*Block* v. *Hirsh*, 256 U. S. 135, 157.) When this court sustained the validity of limitations upon the remedies of the holder of a bond and mortgage created by chapter 793 of the Laws of 1933, we said that ' such legislation, reasonably seeking only *temporary relief*, is not unconstitu-

tional '. (*Klinke* v. *Samuels, supra* [264 N. Y. 144]; italics are new.) ' It is always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends.' (*Home Bldg. & L. Assn.* v. *Blaisdell, supra,* p. 442 [290 U. S. 398].)

" Doubtless such a judicial inquiry would disclose that many — perhaps all — of the adverse conditions created by the ' abnormal disruption in economic  *  *  *  processes ' which, as the Legislature found, existed in 1933 and resulted in a ' public emergency ', disappeared before 1943. The Legislature did not, in 1943, find that these conditions still existed. It found only that the ' serious public emergency ' existing in 1933 and ' *resulting* ' from these conditions, still existed. In 1943 the fact that payrolls and savings bank deposits had increased in almost unprecedented degree was a matter of common knowledge. The Legislature could not ignore the great changes in the economic situation. On the other hand, an accumulation of past-due mortgages resulting from the ten-year-old ban upon actions to foreclose mortgages for default in the payment of principal might reasonably cause apprehension that a flood of foreclosure actions would follow removal of the ban and might itself justify a statute reasonably calculated to stem the impending flood. Reports which legislative committees made to the Legislature in 1938 and 1943 as well as a message of the Governor called to the attention of the Legislature also the fact that abnormal conditions incident to a war economy or resulting from other causes might still constitute a threat ' to the welfare, comfort and safety of the people of the state ' and might call for the exercise of the legislative power to provide an extraordinary remedy for extraordinary conditions.

" The presumption is that the Legislature ' inquired and found ' that under the conditions then disclosed there was need for a continuance of the suspension of the right of holders of bonds and mortgages to foreclose for default in the payment of the principal. (*Szold* v. *Outlet Embroidery Supply Co.,* 274 N. Y. 271, 278.) It is entirely unimportant whether the conditions then existing have created a new emergency, as said by the Governor in his message, or have, as the Legislature said, resulted in the continuance of an emergency itself created by conditions which have run their course. The question which the court must decide is whether the Legislature in the challenged statute has provided an appropriate remedy to tide over an exigency resulting from present conditions. We have

said in an analogous case that: ' Whether an emergency exists or not, the test in each case is whether a situation exists which calls for the exercise of the reserved power of the state and whether the remedy adopted by the state is reasonable and legitimate.' (*Matter of People* [*Tit. & Mtge. Guar. Co.*], *supra,* p. 94.) ''

In *Veix* v. *Sixth Ward Assn.* (310 U. S. 32) the court sustained the constitutionality of a New Jersey statute imposing permanent restrictions upon the right of withdrawal from building and loan associations, saying (per REED, J., p. 39): '' The cases cited in the preceding paragraph make repeated reference to the emergency existing at the time of the enactment of the questioned statutes. Many of the enactments were temporary in character. We are here considering a permanent piece of legislation. So far as the contract clause is concerned, is this significant? We think not. ' Emergency does not create [constitutional] power, emergency may furnish the occasion for the exercise of power.' [*Home Bldg. & L. Assn.* v. *Blaisdell, supra,* p. 426.] We think of emergencies as suddenly arising and quickly passing. The emergency of the Depression may have caused the 1932 legislation, but the weakness of the financial system brought to light by that emergency remains. If the legislature could enact the legislation as to withdrawals to protect the associations in that emergency, we see no reason why the new status should not continue.''

The 1944 amendment to subdivision 2 of section 100-b of the Banking Law being constitutional, and providing in unequivocal terms that the obtaining of an injunction is '' subject to the discretion of the supreme court in the premises '', petitioner is not entitled to such injunction merely upon establishing her good faith. On the other hand, her petition should not be dismissed merely because the corporate fiduciary has agreed to the extension and has obtained the consents thereto from 75% of the holders. The decision in *Matter of People* (*Tit. & Mtge. Guar. Co.*) (*supra*) establishes that participants may be bound to such extension only if the Supreme Court has approved the extension. (See, also, *Doty* v. *Love,* 295 U. S. 64, 70, 71.)

The 1944 amendment, therefore, must be read as conferring upon the Supreme Court discretion to issue the injunction unless it is satisfied that the plan is fair. Even prior to the enactment of the Schackno and Burchill Acts and the 1933 amendment of section 100-b of the Banking Law (then § 188, subd. 7), the Supreme Court was charged with the responsibility of passing on the fairness of any plan for reorganization

of a mortgage held by numerous participants when such a plan was proposed in connection with a foreclosure of the mortgage (*Chase Nat. Bank* v. *10 E. 40th St. Corporation,* 238 App. Div. 370; *Clinton Trust Co.* v. *142–144 Joralemon Street Corp.,* 237 App. Div. 789).

In order to make this requisite determination that the plan is fair and equitable, this court must exercise " an informed and independent judgment " and cannot rely merely on the approval of the plan by a large percentage of those interested (*Case* v. *Los Angeles Lumber Products Co.,* 308 U. S. 106, 114–115).

The papers submitted do not form a sufficient basis on which to predicate such a determination. The practice of the Additional Special Term of this court in passing on extension proposals for certificated or trust mortgages, pursuant to the Schackno and Mortgage Commission Acts or the Burchill Act, is to hold a hearing after notice to all certificate holders or bondholders. In this manner all the relevant facts may be elicited by testimony, subject to the test of cross-examination by interested parties and by the court. The same procedure should be followed here.

Accordingly, this matter will be set down for hearing before this court at a date to be fixed in the order to be submitted. Respondents should give at least twenty days' notice of such hearing to all holders of part interests in the bond and mortgage, in the manner prescribed by subdivision 2 of section 100-b of the Banking Law. In order that all participants may be fully advised of the contentions in support of and in opposition to the proposed extension and modification, respondent shall enclose with the notice of hearing any communication which petitioner desires to send to the other holders and may also enclose such communication as it wishes to send.

Settle order accordingly.